KATE A. SCAGGS, as Administratrix, etc., Respondent, *v.* THE PRESIDENT, MANAGERS AND COMPANY OF THE DELAWARE AND HUDSON CANAL COMPANY, Appellant.

A person passing along a street over a railroad crossing, guarded by gates which are raised, is bound to be vigilant upon that part of the highway the same as upon any other.

While the open gate is an affirmance of safety from the danger of any passing train, this does not dispense with the necessity of vigilance the same as is required of one traveling on a highway where there is no crossing.

In an action to recover damages for the death of D., plaintiff's intestate, alleged to have been caused by defendant's negligence, these facts appeared : Defendant's road crosses a village street at a point near its station. The road at the crossing has five tracks. There are gates at the crossing to prevent entrance upon the tracks when trains are passing. D., plaintiff's intestate, stopped on the street, when the gates were down, waiting to pass when they were raised. A locomotive attached to a train stopping at the depot projected about twelve feet upon the highway ; steam was escaping through the automatic or mechanical device for that purpose, making the usual noise. A horse and wagon was on the street, waiting for the gates to be raised ; the driver was having much difficulty in controlling the horse. The gatetender raised the gate sufficiently to allow D. to go through, and after she passed the locomotive raised the gate so that the horse and wagon could pass. D., after passing the locomotive, started to go diagonally across the street ; the driver of the horse, finding himself unable to control him, hallooed twice to her ; she paid no attention, but walked on, and when between the third and fourth track the horse struck her, causing her death. *Held*, that the evidence failed to show negligence on defendant's part ; and so, that plaintiff was properly non-suited.

*Scaggs* v. *Pres.*, *etc.* (74 Hun, 198), reversed.

*Borst* v. *L. S. & M. S. R. Co.* (4 Hun, 346), distinguished.

(Argued February 8, 1895; decided February 26, 1895.)

SICKELS — VOL. C.       26

APPEAL from order of the General Term of the Supreme Court in the third judicial department, made December 6, 1893, which reversed a judgment in favor of defendant entered upon an order dismissing the complaint on trial at Circuit and ordered a new trial.

The plaintiff brought this action to recover damages from the defendant for causing the death of her intestate. The accident occurred at the Division street crossing of the defendant's railroad, in the village of Saratoga Springs. Division street crosses the defendant's tracks east and west, at a point immediately south of the railroad station. The street crossing at this point is about forty feet in width and planked. Between the east and west sides of the railroad enclosure are five tracks. Gates existed, which shut off the entrance upon the tracks, and which were raised and lowered by the gateman, as occasion demanded. On the morning in question, a locomotive, attached to a train of cars, was standing on the easterly one of the five tracks, alongside of the station, waiting to go south and it projected from twelve to thirteen feet upon the highway crossing. The locomotive was making the usual noises, which accompany the escape of steam through the automatic or mechanical device for that purpose. The intestate was standing by the gatetender on Division street, on the easterly side of the crossing; waiting to pass when the gates were raised. A man named Priester, who was driving a horse to a lumber wagon, was also waiting for the gates to be raised and was experiencing much difficulty in controlling the movements of his horse. He was the principal witness for the plaintiff in the case and he narrated the occurrence as follows: "The train was there before I came to the crossing. When I came there the gates were down. I stopped my horse. They were letting off steam. The gates were down and the gates went up to let this woman through. When the woman got by the cowcatcher, he," (meaning Bentley, the gatetender), "raised the gates and my horse went on. * * * My horse was restless and uneasy. * * * I was trying to manage it. * * * He raised the

gates for the woman to go through; high enough so she could go through without stooping her head. * * * The gate remained in that position until she got by the cowcatcher; then when they went clear up, the horse started. After the gates were up and when my horse was on the first track, I hallooed twice to the woman and when the horse struck the first track the man and I got hold of the lines. We could not hold the horse and we struck the woman. * * * When my horse got on the track, the steam went up straight. It commenced popping off just as I got my horse on the track. When the engine commenced popping off my horse shied on one side." Again he testified: "When my horse started from a point thirty or forty feet east of the first track, this woman was then in front of the cowcatcher, going across the track. That was when my horse started. When my horse got to the first track she was off that track. The engine was on the first track. There are four or five tracks. When my horse reached the first easterly track this woman was between the first and second tracks on the west side. There were two more tracks between the engine and the woman. I went over three tracks before I struck the woman. The woman was between the third and fourth tracks, counting from the east, when the horse struck her. She was walking diagonally across the highway, so that her back and side were towards me and she continued to walk, from the time I first saw her until she was struck, in that direction. * * * She was between the third and fourth tracks at the time she was actually struck. * * * The woman at the time was in the highway where the wagons go. * * * She was going towards the southwest side of the track; the lower side of the crossing; that is, the south side, when she was struck. When my horse struck the first track, I hollered twice to the woman as loud as I could holler. She was then ahead of me a track and a half or two tracks." Again he testified: "When I hollered to the woman, she did not pay any attention, but walked on in the same direction right across." A by-stander, called as a witness on behalf of the plaintiff, testified with regard to what took place

when the intestate was about to cross, as follows: "I stood there a little while and Bentley raised the gate and I looked and saw when he raised it that this lady passed through. I think it stopped when she went under and Bentley looked around towards the horse and raised the gate higher and then the horse went through and that is the last I saw of the woman, as she went around the end of the engine. That is the last I saw of the woman or the horse."

At the close of the plaintiff's case, the trial justice ordered a non-suit; holding, in effect, that the defendant had not been shown to be negligent and that whatever hazard there was in the intestate's crossing, the railroad company did nothing that increased the hazard. The plaintiff appealed to the General Term, where the judgment of non-suit was reversed, by a divided court, and a new trial was ordered. The defendant thereupon appealed to this court; giving the usual stipulation for judgment absolute in case of the affirmance of the order.

*Lewis E. Carr* for appellant. The non-suit was properly granted, because the evidence did not justify a finding of any negligent act or acts of the defendant that were proximate factors in causing the death for which the action was brought. (*Dobbins* v. *Brown*, 119 N. Y. 188; *McCaffery* v. *R. R. Co.*, 47 Hun, 404; *Young* v. *R. R. Co.*, 107 N. Y. 500; *Palmer* v. *R. R. Co.*, 112 id. 234; *Rodrian* v. *R. R. Co.*, 125 id. 526; *Oldenburgh* v. *R. R. Co.*, 124 id. 414; *Unger* v. *R. R. Co.*, 51 id. 497; *Sutton* v. *R. R. Co.*, 66 id. 243; *Burke* v. *Witherbee*, 98 id. 562.) The non-suit was properly granted because the horse and wagon were the producing cause of the misfortune and there was here, in that, and in the acts of the deceased, a new intervening element that breaks the connection between the acts of the defendant and the accident, so that the defendant is not chargeable with the consequences remotely flowing from what it did. (*Day* v. *Crossman*, 1 Hun, 570; *Cary* v. *R. R. Co.*, 23 Barb. 643; *Mars* v. *D. & H. C. Co.*, 54 Hun, 625; *Kerrigan* v. *Hart*, 40 id. 389; *Read* v. *Nichols*, 118 N. Y. 224; *Jex* v. *Straus*, 122 id. 293.) The

non-suit was properly granted, because the only inference that could fairly be drawn from the evidence as to the acts of the deceased was that of failure on her part to exercise such care and caution as she was bound to exercise. (*Rodrian Case*, 125 N. Y. 526; *Tolman Case*, 98 id. 198; *Moebus* v. *Hermann*, 108 id. 349; *Barker* v. *Savage*, 45 id. 191.)

*James W. Verbeck* for respondent. Negligence is not always predicated upon a single elementary act or omission, but may be the result of a combination of two or more acts, innocent and harmless in themselves, separately. (43 N. Y. 569.) A railroad company has no right to block a public highway with an engine, and a gatetender or flagman has no right to mislead the public to their injury. (*Borst* v. *L. S. & M. S. R. Co.*, 60 N. Y. 639; *Palmer* v. *N. Y. C. & H. R. R. R. Co.*, 112 id. 234; *Congdon* v. *D. & H. C. Co.*, 15 Wkly. Dig. 24; *Stinson* v. *N. Y. C. R. R. Co.*, 32 N. Y. 333, 338; *Newson* v. *N. Y. C. R. R. Co.*, 29 id. 383, 390; *Busch* v. *Buffalo C. R. R. Co.*, 29 Hun, 112; *Feeney* v. *L. I. R. R. Co.*, 116 N. Y. 375.) Where an injury to one is caused by and is the natural and probable result of the wrongful act or omission of another, such other is liable therefor, although other causes, put in motion by the act or omission, and which, in the absence thereof, would not have produced the result, contribute to the injury. (*Gibney* v. *State*, 137 N. Y. 1; *Pollet* v. *Long*, 56 id. 200; *Lowery* v. *M. R. Co.*, 99 id. 158–166; *Smith* v. *B. & N. A. R. M. S. P. Co.*, 86 id. 408; *Guille* v. *Swan*, 19 Johns. 381; *Munger* v. *Baker*, 65 Barb. 539; *Billman* v. *I. C. & L. F. R. Co.*, 76 Ind. 166; *Lee* v. *U. R. Co.*, 12 R. I. 383; *Chicago, etc., R. Co.* v. *Dickson*, 63 Ill. 151; *Barrett* v. *T. A. R. R. Co.*, 45 N. Y. 628; *Chapman* v. *N. H. R. R. Co.*, 19 id. 341; *Webster* v. *H. R. R Co.*, 38 id. 260; *Colegrove* v. *N. Y. & H. R. R. Co.*, 20 id. 492; *Sheridan* v. *B., etc., R. R. Co.*, 36 id. 39; *Phillips* v. *N. Y. C. & H. R. R. R. Co.*, 127 id. 657; *Ring* v. *City of Cohoes*, 77 id. 83; *Robinson* v. *N. Y. C. & H. R. R. R. Co.*, 66 id. 11; *Dyer* v. *E. R. Co.*, 71 id. 228; *Masterson* v. *N. Y.*

*C. & H. R. R. R. Co.*, 84 id. 247.) The learned judge who non-suited the plaintiff says : "The woman was not injured by the railroad company ; she was run down by a runaway horse." This, the plaintiff claims, is error, and insists that she was injured by the horse through the negligence of the defendant, and that whether the driver of the horse was negligent or not makes no difference. (4 Hun, 346 ; 66 N. Y. 639.)

GRAY, J. Upon the evidence which the plaintiff adduced in support of her complaint, that the death of her intestate was caused by the negligence of the defendant, I think that she was properly non-suited. The facts very clearly showed that there was nothing done, or omitted to be done, on the part of the defendant to charge it with negligence ; unless it be with reference to the act of Bentley, the gatetender, or with reference to the locomotive and train of cars standing by the station. If we consider, in the first place, what was done by the gatetender, we see him acting in the exercise of his judgment, in letting the deceased first pass under the gate to cross the railroad tracks. He was probably observant of the restless and unmanageable conduct of ˙Priester's horse and, therefore, did not at the time raise the gate high enough to let the horse and wagon also through. But when the woman had passed by the cowcatcher of the engine, which was standing partly upon the street crossing, he then, and not till then, allowed the horse and wagon also to pass through the gates. The gatetender's conduct was not influenced by any fear of danger from passing trains ; but, evidently enough, by a desire to prevent an accident to the woman from the restless horse. Obviously, when the woman had got by the engine, that danger would, in the ordinary exercise of human judgment, cease ; and that would have been the fact here, if, after passing the engine, she had kept either upon her side of the street crossing, or, if she wanted to cross the street, she had first looked to see if any danger was imminent. But she did not do this. Instead of keeping to the north side of the crossing, after passing the engine, she crossed diagonally over

the highway and with so little regard to what she was doing, as to pay no attention to Priester's horse, although he hallooed to her twice. It is clear from the evidence that at the time when she was struck, she was so far beyond the gates she had entered and the railroad train standing on the east track, as to have been able to remain in, or to reach, a place of safety. I think, under such circumstances, it is impossible to predicate any negligence upon what the gatetender did. He was not bound to do more than to take reasonable precautions against the occurrence of accidents to those passing over the highway through the railroad enclosure. Whatever peril existed, whether from the presence of the locomotive, or from the restive horse, was quite as obvious to the deceased as to the gatetender and, if we may assume that he committed any error, it was at most an error of judgment for which the defendant could not be made liable.

Nor was the deceased freed from the obligation to be herself vigilant, when making use of the highway crossing. She was as much bound to be vigilant in the use of her senses upon that part of the highway, as upon any other part. The open gate, through which she was permitted to enter by the gateman, was an affirmance of safety from the danger of any passing train. It did not dispense with the necessity of her being as vigilant, when upon the crossing in the railroad enclosure, as upon the ordinary highway. (*Palmer* v. *Railroad Co.*, 112 N. Y. 234; *Rodrian* v. *Railroad Co.*, 125 id. 526.) I am, therefore, unable to discover wherein the defendant may be deemed to have been in any wise negligent and responsible for what occurred to the deceased, because of any act of commission or omission on the part of the gatetender.

Considering, in the next place, the situation of the train at the station, waiting to go south with its load of passengers; what was there in that fact upon which negligence in the defendant can be predicated? In the opinions of the two General Term justices, who concurred in the ordering of a new trial, "the very position of this engine in the public highway, and the occupation and blocking up of said highway

by it, was of itself an act of negligence." This extraordinary view they based, or rather felt constrained to take, upon the authority of *Borst* v. *Railroad Co.* (4 Hun, 346). In that case the locomotive and train were in the public highway and the plaintiff's horse, while passing along the street, was frightened and shied, so as to run against a wagon and throw out and injure the plaintiff. In that case, the plaintiff claimed that the steam from the defendant's engine blew out more, while he was crossing the track, than it did when he was signaled by the flagman to do so; and the question which the General Term passed upon was the correctness of the refusal of the trial justice to charge, " that if the jury should find that there was any additional noise coming from the engine, after the plaintiff started to cross the track, that unless that increase of noise was caused by the negligence of the defendant or its servants, the defendant was not liable therefor in this action, although such noise frightened plaintiff's horse, and contributed to this injury." It seems that the trial justice explained, in refusing the request, that when the flagman beckoned the passenger, who was waiting in the highway, to cross the track, he had " a right to suppose that no change will take place in anything under the control of the railroad company, likely to increase the danger." This explanation was deemed to be sufficiently correct and the General Term said: " If more steam was emitted from the engine while he was passing than before, that was an unfair surprise to the plaintiff, and if it contributed to the injury, it was the fault of the defendant's agents, for which the defendant was responsible." That is by no means this case. In the first place, we are not informed from the record in that case whether the escape of steam was, as here, the necessary result of a mechanical device upon the locomotive; and, in the next place, there was a sudden increase of the noise from escaping steam at the time the plaintiff passed. In the present case, there was no change in the conditions, which existed while Priester was waiting to pass through the gates and the conditions which existed when he passed the locomotive.

The escape of steam was from an automatic safety valve, which, when the engine is standing, prevents the dangerous accumulation of steam, by letting it off when the pressure reaches a certain point. It cannot, of course, be pretended that the use of such a device, adopted for protection from danger and which acts mechanically and not under the control of the engineer, is negligence. Another distinction between the *Borst* case and the present one, not altogether unimportant to be noticed, is that the recovery there was sought for by a party who was injured by the frightening of his horse and was based upon, as I have before mentioned, a change of conditions from the time when the flagman invited him to cross the tracks and the time when, passing the engine, there was a sudden increase of noise.

Nor can it reasonably be said that the position of the locomotive in the public highway was an act of negligence, which renders this defendant responsible for what happened here. The position of the locomotive had nothing whatever to do with the accident to the woman. She was some distance beyond the locomotive and in a place of perfect safety, as to any danger from a passing vehicle, if she had chosen to look out for its approach. Whether the locomotive stood upon the highway to any extent was a circumstance, which had no possible connection with what happened to the woman. If Priester's horse was so frightened by the escaping steam as to get beyond his control, precisely the same result would have happened if the engine had been fifty or more feet back from where it was. Either we must say that the woman should not have been allowed to pass through the gates, while Priester was waiting to pass with his restive horse, which would be absurd; or we must say that the gate tender, out of an individual consideration of the facts under his observation, used his best judgment, when he allowed the woman to pass under the gates first and then, seeing her beyond the projecting locomotive and, presumably, in a place of safety, raised the gates higher for Priester to pass through with his horse and wagon.

Sickels—Vol. C.     27

Without further discussion of the case, I am of the opinion that the plaintiff was properly non-suited. The facts in evidence, as they group themselves in the mind, make it clear that the plaintiff's intestate received the injuries, from which she died, by reason of an occurrence, for which the defendant is not in anywise responsible, viz. : the breaking away of Priester's horse from his control. Priester had a perfect right to pass over the crossing. There was no train passing, or expected to pass, at the time; and the deceased, in crossing diagonally over ʻthe highway, without apparently looking about her, assumed all the hazards.

The order of the General Term should be reversed and the judgment of the Circuit Court affirmed, with costs.

All concur.

Order reversed and judgment affirmed.