Supp. 953. Damages produced by other agencies than those causing the injury, or even by agencies remotely connected with those causing the injury, ought not to be awarded; but only where the injury flows from the wrongful act as the natural concomitant, or as the direct result thereof. Where speculation or conjecture has to be resorted to for the purpose of determining whether the injury results from the wrongful act, or from some other, then the rule of law excludes the allowance of damages therefor. Railroad Co. v. Birney, 71 Ill. 391; Magilton v. Railroad Co., 11 App. Div. 373, 42 N. Y. Supp. 231. The result must be the natural and probable consequence of the accident, and not of casual or unexpected causes intervening. Whether the death did result from the injury must, in the very nature of things, be a mere conjecture. Admitting, for the sake of argument, that it did so result in this particular case, it can only mean that the jury conjectured rightly. Into such a wide field of conjecture the jury should not be permitted to wander. Its finding upon this point seems to be clearly against the evidence. Upon the unsatisfactory, unsubstantial, and unreliable theories or speculations of one of the physicians it based its finding. The instructions of the court virtually authorized the jury to go into the regions of conjecture, and to undertake to form an opinion on matters entirely beyond its skill, and concerning which it did not have the information necessary for the formation of an intelligent opinion. I am of the opinion that there was no evidence in the case on which the jury was authorized to find that the disease of which the intestate died was occasioned by, or connected with, the injury received from the fall. Such mere speculative possibilities, unsustained by proof, should not be permitted to become the basis of awarding heavy damages, out of all proportion to the character of the wrongful act, or of the nature of the injury occasioned.

The judgment and order should be reversed, and a new trial ordered, with costs to abide the event.

---

(13 App. Div. 574.)

LAIBLE v. NEW YORK CENT. & H. R. R. CO. et al.

(Supreme Court, Appellate Division, Fourth Department. January 27, 1897.)

1. RAILROADS—ACCIDENT AT CROSSING—PROXIMATE CAUSE.
    It is a question for the jury whether the act of a railroad company in obstructing with a freight train a crossing over tracks used by it in common with another railroad company was the proximate cause of an injury to plaintiff, who drove on the crossing, and was delayed by the obstruction for 20 minutes, and until she was injured by her horse taking fright at a passing train of the other company and overturning the buggy.

2. SAME—NEGLIGENCE—FRIGHTENING TEAM.
    Negligence is a question for the jury, where plaintiff, while waiting at a railroad crossing over a much-traveled street, was injured by reason of her horse taking fright at defendant's freight train, which was backed on the crossing without giving any warning of its approach, and with no person on the train in a position to keep a lookout. Follett, J., dissenting.

3. SAME—ACCIDENT AT CROSSING—CONTRIBUTORY NEGLIGENCE.
    Contributory negligence is a question for the jury, where plaintiff was injured by her horse taking fright at a passing train and overturning the buggy,

and it appears that plaintiff, in company with her brother and sister, drove on a crossing where there were a number of tracks; that the gates were open; that plaintiff had never seen any train on the tracks she drove over, and the rails thereof were rusted; that the crossing was obstructed by a freight train which was moving when she came to the crossing, but stopped before it had passed; that, after she had waited 20 minutes for the crossing to be cleared, the train which frightened the horse approached on one of the tracks she had crossed; that after it came in sight there was not time to drive off the crossing; that plaintiff's brother stood at the horse's head, and her sister held the reins; and that plaintiff made no attempt to get out of the buggy.

Action by Elizabeth Laible against the New York Central & Hudson River Railroad Company and the Fall Brook Railway Company to recover for personal injuries. Plaintiff was nonsuited at the Wayne county trial term, and moves for a new trial on exceptions ordered heard at the appellate division in the first instance. Granted.

The defendant the New York Central & Hudson River Railroad Company (that will be referred to hereafter as the "Central") and the Fall Brook Railroad Company had a business and traffic arrangement with reference to their roads at Lyons, the third provision of which was as follows: "The time-tables shall be made and the trains moved under the directions of the officers of the party of the second part [the Central], and the engineers, conductors, brakemen, and other trainmen, while on said road [the Fall Brook], shall be under the control of the officers of the party of the second part." It was further provided that the Central "will furnish at Lyons a passenger station, a freight house, the necessary switching engines, agent, clerks, laborers, engineers, firemen, switchmen, and the other station help to properly transact the joint business of the parties. * * * The Central shall employ and control all employés of the Lyons station." The effect of this instrument was that at Lyons, where the Fall Brook connected with the Central, the trains of the Fall Brook were to be operated under the direction of the Central, but the trainmen on the Fall Brook cars were to be employés of that company. The Central had six tracks at this point, running east and west; track No. 1 being the furthest south. In the village of Lyons, coming from Geneva, and intersecting the West Shore road and the Central road at right angles, and the Fall Brook tracks nearly so, was Geneva street,—a street running north and south. The West Shore road was 450 feet south of Central track No. 1. On the south of the Central tracks, and near track No. 1, was the passenger depot of the Central, 383 feet east of Geneva street. Directly south of this passenger depot, and parallel with the Central tracks for a considerable distance, were two tracks of the Fall Brook, that proceeded parallel to each other until within a short distance of Geneva Street, when they divided into what is called "cross-overs." The northerly cross-over diverged to the north, and united with track No. 1 of the Central after crossing Geneva street, and which is called the "Central Cross-Over." The other cross-over diverged southerly, and crossed Geneva street about 70 feet south of the Central cross-over, and passed in a southerly direction until it intersected the West Shore road, thus creating a "Y," which commenced east of Geneva street. This was called the "West Shore Cross-Over." The purpose of these cross-overs was to connect the Fall Brook trains with the other railroads. On the west side of Geneva street, and near Central track No. 1, and at about the point where the Central cross-over connects with the west line of Geneva street, the Central had established a gate house and had a gate tender. Gates had been placed at that point, or a little north of it, across Geneva street, and were in operation. There were no gates at the West Shore cross-over, or at the West Shore crossing. Passing north along Geneva street, stretching from the West Shore Railroad, on the east side of the street, to Franklin street, was a row of houses, very much obstructing the view to the east. Franklin street was three rods wide, and was parallel with the Central, and was located on the south of, and near to, the Fall Brook tracks. It commenced at Geneva street, and ran east. Along Franklin street on the south were several buildings, commencing at the intersection with Geneva street. On the morning of the 10th of September, 1893 (being Sunday), the plaintiff, a young lady of about 30 years, residing about four miles south of

Lyons, in the country, started with her sister Caroline and her brother Henry to attend the morning service at a church in Lyons. They had a top buggy, the top being about halfway down. They had a gentle horse, that was accustomed to railroad trains, and one that the ladies had driven. At about half past ten in the morning they reached the West Shore tracks, and, seeing no trains, passed over, and up to the West Shore cross-over, and looking in all directions, and seeing no trains, crossed that cross-over, and came to or near the Central cross-over, and observed that the gate was up as they were proceeding, but there was no gateman there to give directions; yet, in looking, they observed that on one of the north tracks of the Central a freight train covered the crossing. They stopped and waited there 20 minutes, all the time the gates being up. The freight train moved a little now and then, and at one time it was opened wide enough to allow some foot passengers to pass through. The plaintiff's carriage and another carriage, containing a brother and two young ladies that were waiting a short distance behind to get over this crossing, were in plain sight of the Central employés; yet the train closed again, and no effort seems to have been made by the persons in charge of the freight train, or by the gateman, who was at a point upon the track near by, to aid the passage of these people over the crossing. After the train closed, the plaintiff's brother, who drove the horse, dropped the lines upon the dashboard of the wagon (which one of his sisters picked up), and went forward to see if the cars could not be separated sufficiently to permit him to drive through. After he had got out of the buggy and had taken a few steps, he looked both east and west, and then observed a train coming from the east upon the West Shore cross-over, nearly south of the Central station, and two or three hundred feet east of Geneva street. This was a Fall Brook train, consisting of four or five box cars, which were being pushed by a locomotive which was in the rear of the cars. They were approaching at the rate of from 12 to 15 miles per hour. The brother, immediately upon seeing the train, hurried back to the horse, seized it by the bits, and was holding it when the Fall Brook train passed in the rear of the horse and buggy, at a distance of about 70 feet. The ladies remained in the carriage. The horse, becoming frightened, jumped towards the right, the wheels of the buggy came in contact with the north rail of the Central cross-over, the buggy overturned, and the plaintiff was thrown out, and her arm broken at the elbow, so as to occasion permanent injury. The plaintiff's evidence tended strongly to prove that no whistle was sounded nor bell rung, or other signal given indicating the approach of the Fall Brook train, nor was there any person upon the front box car of the train, or any of those cars, nor did the gateman give any warning of the approach of this train, and at the time of the accident the plaintiff's horse was standing from 20 to 30 feet from the south rail of the Central track, and either between that and the Central cross-over track, which were 26½ feet apart, or that a part of the rig stood upon the track of that cross-over. At the point where the injury occurred the view east along the West Shore cross-over was unobstructed for about 600 feet only. It would have been impossible for the plaintiff to have turned her horse around and have passed south of the West Shore cross-over to a point of safety after the Fall Brook train came in sight. In order to have reached her point of destination, unless she passed over the Central crossing, she would have been compelled to have driven around out of her way six or eight miles. The plaintiff and her driver were familiar with this crossing, but had not observed trains upon the Fall Brook cross-over on Sundays, and did not know that they were used on that day for the purposes of their trains. There was no noise made by the Fall Brook train in passing behind the buggy, more than the ordinary noise created by a passing train.

Argued before HARDIN, P. J., and FOLLETT, ADAMS, WARD, and GREEN, JJ.

W. S. Jenney, for plaintiff.
Albert H. Harris, for defendant New York Cent. & H. R. R. Co.
A. S. Kendall, for defendant Fall Brook Ry. Co.

WARD, J.    The plaintiff claims that the negligence of the two defendant railroad companies combined to cause the injury which

she sustained; that the Central was at fault for obstructing the crossing an unreasonable length of time, whereby she was detained until, by the action of the Fall Brook Company, her horse was frightened while she was thus detained; and that in this regard the Fall Brook was negligent. The Fall Brook claims that if, in approaching that crossing, it had given notice of its approach, either by ringing a bell or blowing a whistle, it would have created more noise than it did by passing along in the usual way; that it cannot be said that the horse would have been less frightened by such increased noise, but probably more so; that it had the undoubted right, except as to persons who were waiting to cross at its track, to pass over the street at the rate of speed it was going without giving any signals whatever. The Central claims that the proximate cause of the accident was the fright of the horse; that it did not frighten the horse; that while it was true, perhaps, that if the horse had not been detained by the Central occupying the crossing and preventing the passage over it for 20 minutes, the plaintiff and her party would have passed over it in safety, and the horse would not have been frightened, but still the act of the Central Company was only a remote cause of the accident, and under the decisions it was not liable. So, according to the claims of these defendants, neither corporation was liable. We are met in this case with the familiar question as to what is a proximate cause, a concurrent cause, an intervening cause, in such cases? We are obliged to confess that there is much confusion in the cases upon this subject. The courts have explained, refined, distinguished, and elaborated upon this subject until it is difficult to see to which class of these causes, if any, a given case belongs. We may mitigate this uncertainty, under the conditions in this case, in our judgment, by an appeal to first principles, to reason, and to the fountain head of all jurisprudence,—common sense. It seems to be clear that the causes which produced the plaintiff's injury were concurrent, and they were both proximate causes, which we understand to be where two causes are operating directly to produce the same injury or result, and without the existence of each of which the result would not have happened; and, if it so be that one of the causes is the negligence of one party, that party is responsible, whether the other proximate cause was the result of negligence or otherwise. So that whether the proximate causes that we are considering were the result of the negligence of both of these defendants jointly, or only one of them was guilty of negligence, the party guilty of negligence should respond in damages, providing the plaintiff were free from contributory negligence. In Railway Co. v. Croskell (Tex. Civ. App.) 25 S. W. 486, where it appeared in an action for personal injuries against two railroad companies that the track was owned by one of the companies, but was used by both, and that they employed jointly all section employés, including the superintendent, but the men running the trains were employed by the respective companies, the accident was caused by an engineer, under the order of a superintendent, going on a side track, where there was a steep downgrade, and attempting to

couple some loose cars.   The cars were pushed off the side track onto the main track, the two being connected by a split switch, and ran down the grade, colliding with a train of the other company, and injuring the plaintiff, a fireman upon such train.   Held, that both companies were liable, the proximate cause of the injury being their joint negligence.   And in Thompson on Negligence (page 1085, § 3) the author says:

"Where an injury is the combined result of the negligence of the defendant and an accident for which neither the plaintiff nor the defendant is responsible, the defendant must pay damages, unless the injury would have happened had he not been negligent."

In Borst v. Railway Co., 4 Hun, 346, affirmed 66 N. Y. 639, it was held that stopping an engine on a railroad track, where it crosses a public highway, in such a manner as partially to block up the highway, was an act of negligence.   In Railway Co. v. Prescott, 8 C. C. A. 109, 59 Fed. 237, it was held that, where the shying of a horse brings the vehicle into collision with the rear end of a train which wrongfully obstructs most of the street crossing, such shying cannot be regarded as the sole proximate cause, and the jury is justified in finding that the obstruction directly contributed to the accident.

There seems to be no difficulty about the rule thus assumed, and we will consider first the responsibility of the New York Central Company in connection with this accident.   In order to do so properly, we should bear in mind the exact situation, and the connection of this defendant with it.   When the plaintiff was obstructed on her way to church on this Sabbath morning, this defendant had control of three railroads at or near the point of the accident.   It had leased the West Shore, and controlled that.   It had a traffic relation with the Fall Brook, so that it could control the management of its trains at the Lyons connection.   It had surrounded the plaintiff, therefore, at this time, with a network of three railroads. The obstruction on the Central was in front of her.   The West Shore cross-over of the Fall Brook was 75 feet behind her, and the West Shore crossing still further behind.   It will be seen, therefore, that the crossing at which the plaintiff was delayed was a dangerous one, and the duty and care of the Central Company as to people passing along the highway at that point should have been commensurate with the dangers of the situation.   The plaintiff was not the servant of the Central.   She was exercising her right of transit, in passing along that highway.   If there was any negligence on the part of the gate keeper, or the employés managing the freight train in front of her, it was the negligence of this defendant.   The delay at this crossing of 20 minutes was unreasonable; at least, the jury was at liberty so to find.   The legislature of this state has indicated its judgment, in section 421 of the Penal Code, upon the subject of the detention at highway crossings by railroad companies, as follows:

"A person acting as engineer driving a locomotive on any railway in this state * * * who shall wilfully obstruct or cause to be obstructed any farm or high-

way crossing with any locomotive or car for a longer period than five consecutive minutes is guilty of a misdemeanor."

The legislature could not reach by personal punishment the intangible thing, the New York Central Corporation, but it could prescribe a punishment for its employés for obstructing these crossings for a longer period than five minutes; and the necessity which moved the legislature to enact this statute, doubtless, was the well-understood fact that the employés of railroad corporations frequently obstruct with cars the highway crossings to an unreasonable and often oppressive extent, so that travelers upon our highways are greatly delayed. No reason appears in the evidence why this delay of 20 minutes, or any delay further than was necessary for the passage of the train, should have been occasioned by this freight train. The jury had the right to find from the evidence that there was no such reason. It might have found that the delay of 20 minutes in this case was inexcusable; nay, that it had assumed the more aggravated character of a public nuisance. It might have found that, as the train that frightened the horse did not arrive until 20 minutes after the plaintiff had been stopped by the freight upon the crossing, she would have passed beyond danger before the Fall Brook train arrived. So we meet the question sharply raised by the learned counsel for the Central, that this delay was not the proximate cause of the accident, or one of them. The cases we have cited would seem to hold in the other direction. An interesting case was presented to the court of appeals in Gibney v. State, 137 N. Y. 1, 33 N. E. 142. The plaintiff, with her husband and child, while crossing a bridge in Syracuse that it was the duty of the state to keep in repair, met an acquaintance, and stopped to talk with him. The child remained within a few feet of the parents, and suddenly fell through an opening in the bridge into the canal below. The father, as soon as he discovered that the boy was gone, plunged into the canal to recover the child, and both father and son were drowned. The attorney general, for the state, insisted that the hole in the bridge was not the proximate cause of the father's death. The court held otherwise, and the plaintiff recovered. It will be observed in this case that the immediate cause of the father's action was the fact that his child was in the canal and liable to drown; the prior cause was the hole in the bridge. It is assumed in some of the cases as a fair test of what a proximate cause is, is where the result following the cause is such as might reasonably have been anticipated by the wrongdoer in case of a tort, or by a contracting party in the case of a contract. But this is not an invariable test, especially in cases of tort. It was said by Earl, J., in Ehrgott v. Mayor, etc., of New York, 96 N. Y. 280, 281:

"It is sometimes said that a party charged with a tort or with breach of contract is liable for such damages as may reasonably be supposed to have been in the contemplation of both parties at the time, or with such damages as may reasonably be expected to result, under ordinary circumstances, from the misconduct, or with such damages as ought to have been foreseen or expected in the light of the attending circumstances, or in the ordinary course of things. These various modes of stating the rule are all apt to be misleading, and in most cases

are absolutely worthless as guides to the jury.   Leonard v. Telephone Co., 41 N. Y. 544.   Parties, when they make contracts, usually contemplate their performance, and not their breach, and the consequences of a breach are not usually in their mind, and it is useless to adopt a fiction in any case that they were.   When a party commits a tort resulting in a personal injury, he cannot foresee or contemplate the consequences of his tortious act.   He may knock a man down, and his stroke, months afterwards, may end in paralysis or death,—results which no one anticipated or could have foreseen.   A city may leave a street out of repair, and no one can anticipate the possible accidents which may happen, or the injuries which may be caused."

In Grimes v. Railway Co. (Ind. App.) 30 N. E. 200, it was said that:

"Where a horse was frightened by a freight car unlawfully obstructing a street, and ran away and was killed, it was not necessary that the precise injury which occurred could have been foreseen, in order to render the unlawful and negligent acts of the defendant the proximate cause of the injury, as it is sufficient that such injury might reasonably have been expected to occur."

It would seem, therefore, that in cases of negligence, in order to create a proximate cause, it is not, in reason or by authority, made necessary that the wrongdoer's act would have necessarily produced the result complained of, or that he should have anticipated that it would.   In this case, when the Central obstructed the highway it had knowledge that the plaintiff was waiting between the West Shore cross-over of the Fall Brook and its southerly track, and knew, or should have known, that the train of the Fall Brook was liable to come and pass behind the horse waiting at the crossing. Horses that are usually gentle and kind, and not liable to fright when they see an object before them, are quite liable to be frightened by something passing behind them, that they hear and cannot see.   Independent of this question of liability in connection with the Fall Brook train,· it was a question for the jury whether, when the Central assumed to stop people upon the highway this length of time, it should not reasonably have anticipated that events might occur, either from the passing of its own trains, or the trains upon this cross-over, or from other causes, or that the horse might become frightened or restless, and thus cause injury to the plaintiff. Much more should it be held responsible if it were guilty of a nuisance in obstructing the highway.   In Selleck v. Railway Co., 93 · Mich. 375, 53 N. W. 556, a freight train was obstructing a highway, in violation of a statute, and detained plaintiff and his team, when a passenger train came along, emitting smoke and steam, the origin of which was obscured by a freight train.   Plaintiff's horses, which were gentle and used to trains, were frightened by the smoke and steam, and ran away, injuring the plaintiff.   It was held that whether or not the obstruction of the highway by the freight train was the proximate cause of the injury was properly submitted to the jury. The supreme court of Michigan in that case says:

"The obstruction of the highway was a continuous breach of duty.   It was the cause operating at the time of the injury.   The smoke and steam of the passenger train were concurrent, rather than intervening, causes.   They were contemporaneous."

And Cooley on Torts, at page 76, lays down this rule:

"If the original act was wrongful, and would naturally, according to the ordinary course of events, prove injurious to some person or persons, and that does

43 N.Y.S.—64

actually result in injury through the intervention of other causes which are not wrongful, the injury shall be referred to the wrongful cause, passing those which are innocent."

A reference to cases in other states upon this subject may be appropriate. In Waller v. Railway Co., 59 Mo. App. 410, it was held that, where two proximate causes contributed to an injury, one who by his own negligent acts brought about one of such causes is liable for the injury resulting therefrom. In Railway Co. v. McIntosh (Ind. Sup.) 38 N. E. 476, it was held that if a defendant negligently encroached upon, and maintained an obstruction at, the highway crossing, which, concurring with the movement of a passing train, produced the collision which resulted in the death of the decedent, then such negligence would be the proximate cause of the collision. In Ewing v. Versailles Tp. (Pa. Sup.) 23 Atl. 338, a public road was located between two railroads, and was about 13 feet lower than one, and 2 feet lower than the other. Plaintiffs were driving cattle along this road, when they became frightened by an approaching train on the first-named railroad, and they ran upon the other, where they were killed. There was no fence between the road and the railroad, and plaintiffs claimed that the township was liable, for this reason. Held, that whether the absence of the fence was the proximate cause of the injury was a question for the jury. In Andrews v. Railroad Co., 42 N. W. 513, 77 Iowa, 669, it was held that negligence in delaying a railroad engine in a street for an unreasonable length of time is the proximate cause of an injury occurring by plaintiff's team becoming frightened while passing the engine, and by steam escaping therefrom. We refer also to Engelbach v. Ibert (City Ct. Brook.) 31 N. Y. Supp. 438; Quill v. Telephone Co. (Cir. Ct.) 34 N. Y. Supp. 470, and cases cited, where Judge Adams exhaustively reviews the subject. City of Albany v. Watervliet Turnpike Co. (Sup.) 27 N. Y. Supp. 848; Halestrop v. Gregory [1895] 1 Q. B. 561, 15 Reports, 306; Kincaid v. Railway Co., 62 Mo. App. 365; Wilder v. Stanley (Vt.) 26 Atl. 189; Howe v. Ohmart (Ind. App.) 33 N. E. 466.

The learned counsel for the Central seems to rely upon Scaggs v. Canal Co., 145 N. Y. 201, 39 N. E. 716. In that case the plaintiff's intestate was stopped on the street of the village at a railroad crossing where the gates were down. A locomotive attached to a train stopping at the depot projected about 12 feet upon the highway. Steam was escaping from an automatic or mechanical device upon this engine for that purpose, making the usual noise. A horse and wagon were on the street, waiting for the gates to be raised, and the driver was having much difficulty in controlling the horse. The gate tender raised the gates sufficiently to allow the plaintiff's intestate to go through, and, after she passed the locomotive, he raised the gates so that the horse and wagon could pass through as well. The intestate, after passing the locomotive, started to go diagonally across the street. The driver of the horse, finding himself unable to control him, hallooed at her, to which she paid no attention, but walked on, and was struck by the horse, causing her death. Judge Gray held that the automatic escape of steam from the engine had nothing to do with the accident, and says:

"Whether the locomotive stood upon the highway to any extent was a circumstance which had no possible connection with what happened to the woman. If Priester's horse was so frightened by the escaping steam as to get beyond his control, precisely the same result would have happened if the engine had been fifty or more feet back from where it was."

It is not perceived how this case aids this defendant. There was a serious question in this case, also, whether the decedent was not guilty of contributory negligence.

The counsel for the Central also calls our attention to cases decided in other states, which we have examined, but deem it unnecessary to dwell upon them.

The trial court held, as a matter of law, that there was nothing in the plaintiff's case that should have been submitted to the jury. This was error. In what we have said upon the facts, we have not desired to express an opinion as to the merits of the case, as that might tend to prejudice the defendants upon another trial. We simply hold that the questions we have discussed were for the jury.

The next question arises as to the liability of the Fall Brook Company. There is more difficulty in determining that question than in the case of the Central, but we are inclined to the opinion that the trial court should have submitted the case, as to that defendant, to the jury, also. Did the Fall Brook exercise reasonable care in the conduct of its train in crossing Geneva street?—a street greatly used by the public, and over which persons at that time of day were constantly passing. Was it negligence in not having a person upon the front of this train of box cars that was being moved, by an engine from behind, over this crossing? Had such person been there, and seen the situation of the plaintiff and her party, waiting at the Central crossing, and knowing that this train was to pass behind them, and liable to frighten the plaintiff's horse, might the accident have been prevented? Or should the persons managing this train at a reasonable distance east of such crossing have given some signal of the approach of this train, that persons who may have been at or near the crossing could have protected themselves from the approach of this train, or that the gate keeper of the Central could have notice of such approach, from such signals, so that he could have warned the people waiting near his gates of this approaching train? It would seem that these were proper questions for the jury to have considered against this defendant in this case. It is possible that the liability or otherwise of this defendant may be more clearly shown upon another trial, which we have reached the conclusion must occur as to the Central, and we think there should be a new trial as to both of the defendants.

Both defendants claim that the plaintiff was guilty of contributory negligence, as a matter of law, and therefore the nonsuit was right. We will not discuss this point, further than to say that the question of contributory negligence was clearly for the jury.

The plaintiff's exceptions should be sustained, and a new trial granted, as against both defendants, with costs to abide event. All concur, except FOLLETT, J., who dissents from that part of the opinion granting a new trial as to the Fall Brook Railway.