TWIST v. CITY OF ROCHESTER et al.

(Supreme Court, Appellate Division, Fourth Department. February 3, 1899.)

1. MUNICIPAL CORPORATIONS—TORTS—PUBLIC DUTY—POLICE.

The fact that a city permits its police department to construct or use a wire, and that such department is created by law for the discharge of a public duty, will not release the city from responsibility for injuries resulting from defective erection of the wire.

2. SAME—DEFECTIVE STREETS.

A city must use reasonable care to render its streets safe for public use; and, if its negligent acts result in injury to a traveler, it cannot claim that they were so far public as to free it from responsibility.

3. SAME—NEGLIGENCE—QUESTION FOR JURY—ELECTRICITY.

In an action against a city for death caused by contact with a patrol wire which had fallen across a trolley wire, the question of the city's negligence is for the jury, where the wire was put up among trees, where it was liable to become detached by swaying of the limbs, without sufficient guards to protect it, and a parallel and safer line could have been used, and the wire had been abandoned, and permitted to fall into the street several times, to the city's knowledge.

4. SAME—NOTICE OF DEFECTS.

Rochester City Charter, § 218, providing that the city shall not be liable for any roadway out of repair or unlawfully obstructed, unless notice has been given the city, does not apply where a person is killed by a fallen wire that has been negligently erected by the city.

5. SAME—AGENCY.

Notice to a city's superintendent in charge of its patrol lines of the previous falling of a wire is notice to the city.

6. SAME—CONTRIBUTORY NEGLIGENCE—QUESTION FOR JURY.

Whether a person killed by coming in contact with a fallen wire at night in a street was guilty of contributory negligence is for the jury, where he had notice that the wire was down at another place in the street, and warning was given him about the time he came in contact with it.

7. SAME—PROXIMATE CAUSE.

A patrol wire maintained by a city broke, and fell across a trolley wire, but did not reach the street. The employés of the street-car company pulled the wire down, but paused for a moment to attend to their horses, when a person came in contact with it, and was killed. *Held*, that the breaking in the first instance was the proximate cause of the death.

8. SAME—INSTRUCTIONS—CONSTRUCTION.

In an action against a city for death caused by a patrol wire which had fallen across a trolley wire, an instruction that, if the city could have constructed the line originally in another place, it was bound to do so, if the place where it was constructed was dangerous to life, was not error, when taken in connection with an instruction that the city had the right to construct such line, and was chargeable only for negligence in its construction and maintenance.

**9. SAME—DAMAGES—EXCESSIVENESS.**
　　A verdict for $5,000 in favor of a parent against a city for negligently causing the death of a minor son will not be disturbed as excessive.

Appeal from trial term, Monroe county.

Action by Charles Twist, as administrator of the estate of Edward A. Twist, deceased, against the city of Rochester, impleaded with others, to recover damages for negligently killing plaintiff's intestate by a charge of electricity from a fallen wire.　From a judgment for plaintiff, and from an order denying a motion for a new trial, the city appeals.　Affirmed.

Argued before HARDIN, P. J., and FOLLETT, McLENNAN, and SPRING, JJ.

Benjamin V. Cunningham, for appellant.
Thomas Raines, for respondent.

WARD, J.　The city of Rochester, on the 1st day of July, 1887, entered into a contract in writing with the Rochester Electric Light Company of that city, a domestic corporation (which will be referred to as the "Company"), whereby the company agreed to furnish, from time to time, poles suitable for supporting its electric lamps for street lighting in the city, and poles or underground conduits for its wires for transmitting electricity for such lamps at such place or places and in such numbers as the city, by its common council, should from time to time, during the continuance of the contract, direct; to keep the poles properly painted; and to set, and from time to time, as might be required, to change, the same, at its own expense, under the direction of the common council, and in such place or places as the common council should direct, and keep in first-class condition said lamps and all appurtenances thereto or connected with the same.　And the contract further provided as follows:

"The party of the first part [the company] shall also place and at all times maintain in good condition a suitable cross-arm on each pole erected and placed by it as aforesaid at the top thereof, or such other location as may be agreed upon by the party of the first part and the said common council; or, in case of an underground conduit or conduits, there shall be at all times kept in good condition a suitable space therein.　And the party of the first part shall grant to the party of the second part [the city] and its agents the exclusive use of said cross-arm or space aforesaid, free of charge, at any time during the period thereof [the existence of the contract], for any and all municipal purposes, and placing of any and all telegraph or other electric wires owned and used by it other than for lighting and power.　The party of the first part shall also, upon the requirement of the common council, immediately remove any and all of its poles after its or their use have been discontinued for three consecutive months."

The contract further provided that the common council should at all times freely inspect the works, plants, dynamos, lamps, wire, and all apparatus connected therewith of the company, and the quality and condition of the wire and lamps used in and about the furnishing of such lights.　The city further agreed to take and use, during the continuance of the contract, at least 100 electric lights, and pay for the same at a rate fixed; the contract to terminate on the 1st day of July, 1892.

Pursuant to this contract, and in the year 1888, the company erected poles along and on both sides of Mount Hope avenue, one of the most prominent streets in the city, which runs substantially north and south, and near the east bank of the Genesee river, and nearly parallel with a water channel called the "feeder," the avenue intersecting Edgewood avenue (known in the case as "Sandford Street") and Cypress street, they being on the east side of the avenue; and between these two streets occurred the death of the plaintiff's intestate, from a charge of electricity, on the evening of July 15, 1892. The east bank of the feeder in the vicinity of these intersecting streets was about 100 feet from the west side of Mount Hope avenue. The poles erected by the electric light company were about 40 feet high. One of these poles was on the east side of the avenue, at the corner of Sandford street. Diagonally across and on the west side of the avenue was another pole, nearly opposite to a structure known as the "Church Home." On the east side of the avenue, and further south, and opposite of the premises of one J. L. Pauckner, another pole was located. On the west side of the avenue, and still further south, diagonally from the last-named pole, stood a pole, opposite of Cypress street. The direct distance from the first to the last named pole was about 400 feet, and the distance along the diagonal line was about 443 feet. Prior to 1890 the Rochester City & Brighton Railway Company had operated a street-surface railroad, by means of horses, through Mount Hope avenue. This railroad, in March, 1890, was leased to the defendant the Rochester Railway Company, with all its franchises and property. In the spring of 1890, upon application made to the common council of the city, that body granted leave, by resolution, to the Rochester Railway Company, to construct its line in the avenue; and an agreement was entered into between it and the city to change the motive power of said street railway from horses to electricity, and the Rochester Railway Company equipped its road, and began its operations, by the trolley system, through Mount Hope avenue. It was provided that the work must be satisfactory to the proper city authorities; and, when they required it, the company should place guard wires to prevent the trolley wire from coming in contact, by reason of accidental breakage or otherwise, with electric, telephone, or other wires; that the company should cause to be maintained sufficient electric current through the guard wires to ring a bell at the central station in the event of any wire falling or coming in contact with the guard wire; and the proper city authorities should have general charge and supervision of the kind and quality of poles to be erected, the location of the same, and the work of construction of the railway company. The railway company constructed two tracks through Mount Hope avenue, with poles 18 feet high, and wires for electric currents in the street; the line of said poles passing under the diagonal lines to which we have referred. After the construction of the electric and trolley lines, and in June, 1890, there was constructed upon the poles of the electric light company, through the agency of the city, a line of wires called the "Patrol Line." These wires were placed upon the poles about three feet above the electric wires, at the place reserved by the city for wires under the contract. There were no guard wires or tree

supports constructed in connection with this patrol wire. The only fastenings were the fastenings to the insulators. The patrol wires were bare copper,—No. 12 wires. The electric company wires were No. 4 electric light wires, with, as the proof tended to show, defective insulation. The trolley wires were bare No. 4 copper wires. On both sides of the avenue were trees of considerable size, at short distances apart, the limbs of which projected into the street in the space between Sandford and Cypress streets, which interfered to a considerable extent with the electric light and patrol line. For a long time prior to the accident,—and the proof seems to indicate more than a year,—the city had abandoned the patrol line through Mount Hope avenue along the place of the accident, but left the wires unused, at times disconnected and broken, and were using a line along the east bank of the feeder, but connecting with the avenue further south. The patrol wire along or near the place of the accident, on several occasions, dropped into the street. On one occasion a horse was killed by the electric current from the fallen wire. At one time a wire fell down in front of William Pauckner's place, who had a store upon the corner of the avenue and Cypress street, which came down first about 16 months before the accident. When the horse was killed, it came down again, a few weeks before the accident; and, the last time it fell, Mr. Pauckner took it out of the way, burning 100 feet of it off, which he kept. The city never constructed another wire in the place of the one removed. This was one of the patrol wires. The other seems to have remained among the trees until the time of the accident. Other witnesses speak of the wire being down on other occasions prior to the accident. The condition of the wire, and its falling before the accident, were brought to the actual knowledge of the officers of the city who had charge of the line, and whose duty it was to protect the public in regard to it.

The plaintiff's intestate was a son of the plaintiff; was 19 years old, a healthy, bright, industrious young man, living with his father, and earning wages, which he gave to his father. His only difficulty seems to have been a slight or partial deafness. He had been 15 months in the employ of a meat-market concern. On the night of the accident, he had a package of meat to deliver at the Church Home. He entered the avenue by way of Clarissa street, which was north of Sandford street, and passed along the east side, until he crossed over to the Church Home, on the west side, a few minutes before he was killed, where he delivered his package, and shortly returned. The time was from half past 8 to 9 o'clock in the evening, and it was quite dark, so that an object as large as a man could be seen but at a little distance. As he reached the trolley track between Sandford and Cypress streets, his neck encountered a patrol wire that had been disconnected from the pole, and had descended to within about four feet of the ground, when he received a charge of electricity which caused his immediate death. This electricity was communicated to the wire from the trolley wire. Shortly before this accident, a repair wagon in charge of two employés of the Rochester Railway Company came along, and discovered the wire running from what was called the "Church Home Pole." It came down from a

tree which involved the patrol lines, and rested on the trolley wire. One of the employés pulled the wire down out of the tree to the point where it struck the deceased. There was some difficulty with the horses. The employé paused a moment, pulled on his gloves, with a view of again handling the wire. At that precise time the deceased came along, and was killed. At that time the company was not running its cars on that branch of its road, as repairs were in progress, but its wires were charged with electricity the same as if the cars were in operation.

At the expiration of the contract with the electric light company, a new contract was made between it and the city, extending for several years. It continued in effect the relations between the parties as specified in the first contract; and, in the specifications which were made a part of the contract, it was provided that the poles and cross-arms were to be of a kind and size, and be subject to be changed or removed whenever, in the judgment of the common council, public safety or convenience demanded the same. A storm of wind and rain preceded the accident. The defendant contended that this was a very violent storm of wind and rain, one of the worst that had ever occurred, which caused the wire to become detached from the pole; and it was not within the contemplation of the contract of the parties that the patrol line was to stand any such storm, but only the ordinary storms in that locality. The plaintiff's proof tended to show that it was not an extraordinary storm for that time of the year (July). The weather observer testified that the velocity of the wind did not exceed 28 miles per hour. It appeared in the case that the feeder line was substantially free from trees, and was not subjected to the danger that was apparent as to the line among the trees in the avenue. The trial court fairly submitted the issues in the case to the jury, which found for the plaintiff, and we cannot disturb their verdict as being against the weight of evidence.

The appellant presses the point that it was not responsible for the defective construction of the patrol line, because it was used by the police department of the city, and as that department is created by law for the discharge of a public duty, and not for the immediate benefit of the city, the city is not liable for the negligence of the police commissioner in the construction and maintenance of the patrol wire; citing Woodhull v. City of New York, 150 N. Y. 450, 44 N. E. 1038, and kindred cases. The difficulty with this contention is that the preponderance of the evidence does not show that the line was constructed by the police department or its servants, but was done by virtue of a contract with the city, and by city officers who were empowered to and did represent the city. The powers of the police department of Rochester are enumerated in the charter of the city, and the authority to create and operate telegraph lines as an independent body is not among its enumerated powers. That power rests, under the charter, with the city alone, to be performed through the agency of departments and officers that represent the city. If it be the fact that the city permitted the police to construct this line or to use it after it had been created, that does not bring the case within the principle claimed by the appellant. In Woodhull v. City of New

York, supra, the action was against the cities of New York and Brooklyn for false imprisonment on account of the action of a police officer appointed and under the control of the Brooklyn Bridge trustees, as a street car was starting over the bridge. It was held that the cities were not responsible for the act of this policeman. Other cases may be cited where it was held that the municipality was not responsible for the acts of policemen who were acting under the orders of the police department, and within the scope of their police duties, and this is upon the principle that the police are appointed by the municipality in obedience to a statute to perform a public service, not local or corporate, and to perform a service in which the municipality has no pecuniary interest. But this rule and these cases have no application to a service performed by police officers without authority of law, in the pecuniary interests of the corporation. In such a case, when the police officer acts, it is outside of his public duties, and he becomes the servant of the municipality whose pecuniary interests he serves. The distinguishing feature is the character of the service he performs, and not the name or the title under which he performs it. The city had secured the right to put these wires upon the electric light pole for a consideration. It had agreed to take a certain number of lights, and pay for them. The patrol line was the result of a business arrangement on the business side of the municipality, and it was in no sense in furtherance of a public duty. When the line was made, the city could use it for any legitimate purpose connected with its police or otherwise, without changing the character of the thing from a private, pecuniary matter to a public one; but in highway or street cases another principle intervenes. The municipality in such cases is bound to use reasonable care to render the streets safe for public use and travel, and the decisions are uniform that where a municipal corporation permits a nuisance in its streets, or commits negligent acts, which result in injury to a person using the streets, the corporation is liable in damages to the person injured if he is free from contributory negligence, and cannot protect itself under the claim that its acts were so far public that it was free from responsibility. Turner v. City of Newburgh, 109 N. Y. 301, 16 N. E. 344. This duty in regard to the streets existed before the city permitted the invasion of the avenue by the Rochester Gas & Electric Company or by the Rochester Railway Company, and that duty continued with the additional care thrown upon the city as a result of introducing electricity into the street. The city had wisely reserved, by its contracts with these other parties, the right to protect the street as against this additional danger. It should have enforced those rights, and exercised reasonable care in exercising its powers under its contract to protect the public. The jury has found that it has failed to do so, and, as a result, the death of the intestate.

There was evidence of the defendant's negligence sufficient to be presented to the jury in this case. Some of the facts tending to prove such negligence may be enumerated. The patrol wires were put up without sufficient guards to protect them, among the trees of the avenues, where they were liable, by the swaying of the limbs, to be detached from the poles, and connect with the deadly currents below.

There was evidence tending to show that a parallel and safer line for the patrol line could have been selected and used without difficulty. The city, when it permitted the trolley lines and the electric light lines to be constructed and continued directly under the patrol lines, which were liable to be detached, must have been cognizant of the dangers of the situation, and should have exercised care both of construction and inspection commensurate with that danger. It was guilty of gross negligence in permitting the unused patrol wires, after they had been abandoned, to fall into the street time and again, to the obvious danger of the people in the street. It is true that the current which passed through those falling wires is harmless; yet when they touched the bare wire of the trolley below, or even the electric wire above the trolley wire, they became immediately charged with a deadly force, liable to produce just such a result as in this case.

But it is claimed that the city of Rochester was not liable under the city charter (section 218), which provides that:

"The city of Rochester shall not be liable for any road-way being out of repair or unlawfully obstructed unless actual notice of the unsafe or dangerous condition has been given to the city officers having charge of the highways a reasonable time before the happening of such injury,"—citing Smith v. City of Rochester, 79 Hun, 174, 29 N. Y. Supp. 539, affirmed 150 N. Y. 581, 44 N. E. 1128.

In so far as the city is liable for the negligent construction of the patrol line, or the other negligent acts and neglect of duty to which we have referred, the city needs no actual notice, because it is presumed to know its own acts, and therefore has actual notice. As to its notice of the falling of the wire prior to the accident, Mr. Barnes, the superintendent, representing the city, and who had charge of the lines, and whose duty it was to see that it was kept in good condition, had actual notice. He testified that he remembered three occasions where the line had been broken down by one means or another within two years preceding the accident. Stedman v. City of Rome, 88 Hun, 279, 34 N. Y. Supp. 737; Riddle v. Village of Westfield, 65 Hun, 433, 20 N. Y. Supp. 359; Wilson v. City of Troy, 135 N. Y. 102, 32 N. E. 44; Turner v. City of Newburgh, 109 N. Y. 301, 16 N. E. 344.

The learned counsel for the appellant strenuously contends that there should have been no recovery, because the deceased was guilty of contributory negligence. This objection is best answered by the charge of the learned trial judge upon that subject. After stating that it was incumbent upon the plaintiff to satisfy the jury by a fair preponderance of evidence that Edward Twist was not himself careless, and did not contribute to his death, and that if he went upon the street knowing that this wire was there, and walked into it carelessly, and met his death, no recovery could be had, then the court proceeds:

"The case shows that, at an earlier part of the evening than the time when the accident occurred, Edward Twist was near the corner of Clarissa street, and there saw boys playing with a broken wire, and that he knew that there was a broken wire at that point. There is no evidence that he knew there was a loose or broken wire above [north] the Sandford street pole. It seems that later this wire was down between the Sandford street pole and the Church Home pole, which was the wire with which Edward Twist came in contact, and which caused his death. It appears that he was engaged in an occupation which required him to be in the street. He had a package of meat

to be delivered, and the inference is fair that it was to be delivered at the Church Home; that he went there, and on his return he came in contact with this wire, and fell to the ground, and he was taken up dead. There is evidence tending to show that a warning was given. Some of the witnesses say that he was almost upon the wire when the cry came, and that he seemed to be bewildered, and turning his head towards the west side of the avenue, from which side, some of the evidence tends to show, the alarm came, he came in contact with the wire. There is evidence from other witnesses that he was further from the wire when the warning was given. There is also evidence that his hearing was impaired. If he did not hear the warning, or if he was confused, and in that way ran into the wire unconsciously, not knowing it was there, he would not be guilty of contributory negligence. Upon all this evidence, you will determine whether he was prudent and cautious in crossing the street, and what knowledge he had of the danger he was going into. If he was not aware of this danger, and was using proper care, you will find upon that branch of the case in favor of the plaintiff."

The judge might well have added that the night was so dark that he could not see this little wire until he was close upon it; that at the time he was advised that the wire was down, in the early part of the evening, at another place, when the boys were playing with it, he expressed a wish that no one would get killed with it. The question of contributory negligence was plainly for the jury.

It is also contended by the appellant that the negligence of the city was not the proximate cause of the injury; that the wire, when it broke, only fell across the trolley wire, and did not reach down to the street, and it would not have come in contact with the deceased had not the railway company and employés pulled the wire down. There is no doubt but that the act of the employés was a concurring cause of the accident, but had not the line fallen from the trolley wire, having been disconnected from the pole for want of proper construction or want of due care on the part of the city, the accident would not have occurred, coming within the principle that, where an injury is the combined result of the negligence of the defendant and an accident for which neither the plaintiff nor the defendant is responsible, the defendant must pay damages, unless the injury would have happened had he not been negligent. Thomp. Neg. p. 1085, § 3; Quill v. Telegraph Co., 92 Hun, 546, 34 N. Y. Supp. 470, and 37 N. Y. Supp. 1149; Laible v. Railroad Co., 13 App. Div. 574, 43 N. Y. Supp. 1003. In the Quill Case the plaintiff was injured by the fall of an insulator from the defendant's telephone pole. The insulator, although not properly secured, would not have fallen had it not been knocked off by a third person, for whose acts the defendant was not responsible; nor would the acts of such third person have knocked it off had it been securely attached. Held, that both the defective attachment of the insulator and the act of the third person were the proximate causes of the accident, and it might therefore be attributed to either or both of them.

The appellant complains of the charge of the court as follows:

"It was error to charge that the city of Rochester was bound to·remove its wires to another place, and that it should have originally constructed it in a different place," evidently referring to the feeder bank line.

The counsel has misapprehended the charge of the court in that regard. The court said:

"Now, if you find that this was a dangerous place by reason of the proximity of the trees, or if for any other reason, in which to construct this patrol line, and that it could have been avoided without difficulty,—if the city could have constructed the line originally in another place, or if, after the trolley line had been constructed, it could have changed the line to another place without difficulty, it was bound to do so, if the place where it was constructed was dangerous to human life, and it could have been avoided without difficulty; and, if a line constructed on the feeder bank was practicable, the city was bound to use that, and avoid this danger. It is for you to say whether the falling of this wire upon the trolley wires was a danger that was to be apprehended, and if it was, and this danger could have been avoided, that should have been done."

At the close of the charge, the counsel for the defendant asked the court to charge that:

"The city had the right to construct this line on Mount Hope avenue, and was only chargeable for negligence in the construction or maintenance of the same."

The court so charged, and, taking the two charges together, there was no error.

At the close of the evidence, the trial court dismissed the complaint as to the Rochester Railway Company and the Rochester Gas & Electric Company, that were joined as defendants with the city of Rochester, and refused to dismiss as to the city. The counsel for the city, however, asked the court to let the case go to the jury as to the negligence of the other defendants, which was refused, and the exception to such refusal is urged here as a ground of reversal. This point is without merit.

Finally, the appellant claims that the damages were excessive. The verdict was $5,000. The statute permitted the jury to render a verdict up to that amount. The appellate court should only interfere with it where the amount is so excessive as to indicate passion or prejudice on the part of the jury, or greatly beyond any possible loss that could have come to the next of kin. It is unnecessary to review the cases upon this subject. We are of opinion that this point is not well taken. No exceptions are presented taken upon the trial upon the reception or rejection of evidence.

We find no reversible error in the points presented by the appellant, and the judgment and order appealed from should be affirmed.

Judgment and order affirmed, with costs. All concur.