**MERRITT–CHAPMAN & SCOTT CORPORATION, Plaintiff,**

v.

**PUBLIC UTILITY DISTRICT NO. 2 OF GRANT COUNTY, WASHINGTON, Defendant.**

United States District Court
S. D. New York.

July 19, 1962.

Cleary, Gottlieb & Steen, New York City, for plaintiff, William L. Lynch, James W. Lamberton, Dennis J. Kenny, New York City, of counsel.

Root, Barrett, Cohen, Knapp & Smith, New York City, for defendant appearing specially, Washington & Wickwire, Ephrata, Wash., Whitman Knapp, New York City, Nat W. Washington, Ephrata, Wash., Neal J. Hurwitz, Edmund R. Schroeder, New York City, of counsel.

NOONAN, District Judge.

This is a motion by defendant, Public Utility District No. 2 of Grant County, Washington, made pursuant to Rule 12(b), Federal Rules of Civil Procedure, 28 U.S.C.A. Defendant, appearing specially,[1] moves the court for an order:

1) vacating a warrant of attachment and setting aside the levy thereunder upon the Bankers Trust Company and

2) setting aside the service of summons on the ground that the property and credits alleged to have been attached were not subject to attachment and, in any event, were not the property of or credits of defendant.

Public Utility District #2 of Grant County, Washington, was established by vote in 1938 and has its headquarters at Ephrata, Washington. Since January 1942, the District has owned and operated an electric distribution system serving all of the populated areas of the County. This system is referred to as the Distribution System. The financing operation and ownership of the Distribution System was consolidated under Resolution No. 75 of the District which provides among other things that the District may incur indebtedness to finance the acquisition or construction of additional generating transmission and distribution facilities. "As permitted, * * * the District has established the Production System for the purpose of financing the construction of the Priest Rapids Development by the issuance of the Bonds, the funds, prop-

---

1. See Rule 12, Federal Rules of Civil Procedure Commentaries Sec. 4 on the subject of special appearances.

erties, operations and business of which shall be accounted for separately from those of the Distribution System. The Production System is not a separate legal entity but is in the nature of an operating division of the District under the control of the Commission", which administers the District. (Official Statement, page 2).

In 1954, Congress granted the District the right to develop the Priest Rapids Hydro-Electric Project on the Columbia River under a license issued pursuant to the Federal Power Act. On November 4, 1955 and June 1, 1956, the Federal Power Commission granted the District a license permitting the District to develop, construct, operate and maintain as a single project the Priest Rapids Hydro-Electric Project consisting of (1) the Priest Rapids Development, and (2) the Wanapum Development at a site approximately 18 miles upstream from the Priest Rapids Development site.

In order to finance the development, revenue bonds were authorized in the amount of $166,000,000. These funds so acquired were then placed in various funds to wit, the Bond Fund, Revenue Fund, Renewal Fund, Replacement Fund, Construction Fund and Construction Interest Fund. The subject of this motion concerns only the last two funds on deposit in Bankers Trust Company in New York, which have been attached.

Prior to entering into any contract for construction of the Priest Rapids Development, the District and twelve public and private electric utilities (the "Purchasers") entered into power sales contracts. Under these contracts, which will not expire until October 31, 2005, the Purchasers will buy 63.5% of the output of the Production System; the District has reserved 36.5% of the power output for its own Distribution System and for sale to others.

The twelve purchasers operate private and public electric utility systems in the states of Washington, Oregon, Idaho, Montana and Wyoming. Thus approximately ⅔ of the output of the Produc-

tion System was sold by the District for a term of 49 years. The power reserved by the District for itself and for sale to others was estimated in 1956 to amount to 230,242 kw. In 1955, the District's own Distribution System had a maximum demand for 63,006 kw.

On July 9, 1956 pursuant to competitive bid and award, Merritt-Chapman & Scott Corporation, plaintiff herein, a Delaware corporation with its principal offices in New York, New York, entered into a contract with the defendant District for the construction of the Priest Rapids Dam. A construction period was established that would result in completion of the Production System by October 1961.

On September 28, 1961, the District's construction engineers certified to the District that construction of the dam by Merritt-Chapman & Scott Corporation was completed. When the District refused to pay over the funds claimed by Merritt-Chapman & Scott Corporation to be due upon completion of construction, Merritt-Chapman & Scott Corporation commenced suit against the District in the New York Supreme Court.

On March 7, 1962, the New York Supreme Court issued a warrant of attachment against funds of the District in New York, and a levy was made thereunder on funds on Deposit with Bankers Trust Company, New York, New York. Subsequently, the summons and verified complaint were duly served upon the District, and on March 26, 1962, this cause was removed to this Court by the District.

It is the position of the defendant that:

a) Public Utility District #2 is a political subdivision of the State of Washington, is "engaged in the performance of essential functions", and, therefore, its property is immune from attachment.

b) Public Utility District #2 further maintains that its funds now on deposit with Bankers Trust Company are trust.

funds and therefore not property subject to attachment.

The court will address itself to the first of the two arguments set forth by the defendant. There seems to be little doubt concerning governmental status of Public Utility District #2. The basic enabling legislation enacted in 1931 by the people of the State of Washington established the District as a political subdivision and municipal corporation of the State. In Public Utility District No. 2 of Grant County v. Washington State Power Commission, 46 Wash.2d 233, 280 P.2d 264 (1955), the Supreme Court of the State of Washington declared Public Utility District #2 to be a "political subdivision of the state".

Public Utility Districts in Washington have been empowered to levy and collect taxes within their respective geographical limits. The districts are to be governed by commissioners elected by the people at general elections. All of the above clearly point to the fact that Public Utility District #2 was and is to be considered a political subdivision of the State.

■ Whether or not the property of a municipal corporation is subject to foreign attachment appears to depend upon whether such property is derived from a proprietary function engaged in by the municipal corporation. The law is clear in New York that funds of a municipal corporation collected through ordinary governmental means for local purposes cannot be the subject of attachment. Thus in Van Horn v. Kittitas County, Wash., 28 Misc. 333, 59 N.Y.S. 883 (Sup.Ct.N.Y.Co.1899), aff'd 46 App. Div. 623, 61 N.Y.S. 1150, the court in vacating the levy of attachment stated:

"It appears that the treasurer of the defendant (Kittitas County), in the performance of his duties remitted to the Chemical Bank, in the city of New York, a sum of money for the payment of coupons, representing interest about to fall due on certain bonds which had been issued by the defendant, and which, by the terms of the coupons, was payable at that bank. This money had been raised by taxation, and had been appropriated for the payment of interest in question. It is true that there was nothing in the arrangement between the defendant and the bank which constituted the latter a trustee for the holders of the coupons, so as to give such holders an interest in the fund which could be enforced against the bank * * *. The bank was the mere agent of the defendant or of its treasurer, and the money was subject to recall at any time before it was applied to the purposes for which it had been remitted so that it continued to be the exclusive property of the defendant. It was not, however, the property of the county, in any private or proprietary sense, but was acquired by it for a public purpose, in the exercise of its political powers, and was appropriated for a specific purpose, inconsistent with its use for the discharge of the plaintiff's claim. * * * It is well settled that property thus acquired, held, and appropriated by a public corporation is not subject to levy. In support of this proposition it is sufficient to cite 1 Dill. Mun.Corp. § 100, where the learned author says:

" 'The revenue of the public corporation is the essential means by which it is enabled to perform its appointed work. Deprived of its regular and adequate supply of revenue, such a corporation is practically destroyed, and the ends of its creation thwarted. Based upon considerations of this character, it is the settled doctrine of the law that not only the public property, but also the taxes and public revenues of such corporations, cannot be seized under execution against them, either in the treasury, or when in transit to it. * * * The doctrine of the inviolability of the public revenues by the creditor is maintained,

although the corporation is in debt, and has no means of payment but the taxes which it is authorized to collect.' "

Where, however, it has been shown that property of a municipal corporation has been acquired through a proprietary venture, the courts in New York have allowed a levy of attachment on such property. In Harman v. City of Ft. Lauderdale, 134 Misc. 133, 234 N.Y.S. 196 at p. 198 (Sup.Ct.N.Y.Co.1929), the court stated:

"This levy under this valid attachment should be upheld, for the reason that the property and property rights so levied upon are, in my opinion, clearly property of the Broward County Port Authority, which it holds in a private and proprietary capacity, as distinguished from a governmental and political capacity. * * * In my opinion such functions are private and proprietary, and the operation, control, and management of a harbor district improvement within the powers here conferred upon this Port Authority essentially are not governmental or political functions, but are in the nature of a private business enterprise engaged in with the hope of revenue. The courts in this state have frequently recognized the distinction between those activities of a municipal corporation which are governmental in character and those which are commercial."

Likewise in Doyle v. City of Astoria, Oregon, 147 Misc. 127, 262 N.Y.S. 572 (Sup.Ct.N.Y.Co.1932), aff'd 238 App.Div. 833, 262 N.Y.S. 973, the Court allowed the funds of a municipal corporation raised through a proprietary venture to be attached.

We come now to what this court considers the central point on the motion, that is, whether the activities of Public Utility District #2 constitute local governmental duties or whether such a venture is private and proprietary in nature with the resulting consequence that any funds derived from the activity may be considered proper subject matter for attachment.

As the Supreme Court said in Brush v. Commissioner, 300 U.S. 352, at p. 365, 57 S.Ct. 495, at p. 498, 81 L.Ed. 691:

"We thus come to a situation, which the courts have frequently been called upon to meet, where the issue cannot be decided in accordance with an established formula, but where points along the line 'are fixed by decisions that this or that concrete case falls on the nearer or farther side.' Hudson [County] Water Co. v. McCarter, 209 U.S. 349, 355 [28 S.Ct. 529, 531, 52 L.Ed. 828]. We are, of course, quite able to say that certain functions exercised by a city are clearly governmental—that is, lie upon the nearer side of the line—while others are just as clearly private or corporate in character, and lie upon the farther side. But between these two opposite classes, there is a zone of debatable ground within which the cases must be put upon one side or the other of the line by what this court has called the gradual process of historical and judicial 'inclusion and exclusion.' Continental [Illinois] Bank [& Trust Co.] v. Chicago, R. I. & P. Ry. [Co.], 294 U.S. 648, 670 [55 S.Ct. 595, 603, 79 L.Ed. 1110], and cases cited."

When Public Law 544, 83d Congress Chapter 589– 2d Session H.R. 7664, 68 Stat. 573 was passed by Congress permitting the development of Priest Rapids Dam, it was foreseen that such a project would provide navigation locks and effective flood control for that area in which it was to be built. Such projects are certainly governmental in nature. The fact that the navigational locks as yet have not been installed seems to be an engineering problem and not cause for suggesting that their installation will never be effected.

It would seem that the principal basis for plaintiff's position that Public Utility District #2 is acting in a private and proprietary manner stems from the executed Purchaser's Contracts, (noted

above), and the resulting funds acquired therefrom.

The presence of a governmental agency in the field of producing electricity is not a novel approach to fulfilling this public need. In New York State we have the Power Authority of the State of New York created,

> "In order to provide for the most beneficial use of these natural resources, for the creation and development of hydroelectric power in the interest of the people of this state * * *." § 1001 of the Public Authorities Law of New York (McKinney's Consol.Laws, c. 43–A, Vol. 42, Part I).

The Court can see no prejudice to the Public Utility District #2 position as a governmental agency operating an essential governmental function from the fact that it has entered into various contracts to sell the power developed by the Production System. Public Law 544, Sec. 6, provides:

> "such license shall provide that the licensee shall offer a reasonable portion of the power capacity and a reasonable portion of the power output of the project for sale within the economic market area in neighboring States * * *".

The percentages of power to be so appropriated were carefully determined by engineers, based on the productivity of the development. With respect to the funds received for such allotments it is the opinion of this court that they do not represent profits from a venture, under the law as found in Harman v. City of Ft. Lauderdale, supra. The contracts in question provide that the Purchasers each year agree to pay the cost of the power allocated to it.

These contracts provide that before the beginning of each contract year the District shall estimate the cost of production; that each "Purchaser" shall pay its share of such estimated cost in equal monthly installments throughout the year; that after the end of each year an audit shall be made to determine the year's actual costs; and that, upon submission of each audit, each "Purchaser" shall either make up any deficiency resulting from an inadequate estimate or receive a credit for any balance that may have resulted from an excessive estimate. The cost of production includes, of course, the establishment and maintenance of adequate reserves and working capital.

At the expiration of the fifty year contract term, all such "working capital and all reserves" will be distributed pro rata among the Purchasers.

On the subject of profits the court is reminded of what the Supreme Court stated in Brush v. Commissioner, supra, 300 U.S. at p. 372, 57 S.Ct. at p. 501:

> "Respondent contends that the municipality, in supplying water to its inhabitants, is engaged in selling water for profit; and seems to think that this, if true, stamps the operation as private and not governmental in character. We first pause to observe that the overhead due to the enormous cost of the system, and the fact that so large a proportion of the water is diverted for public use, rather plainly suggests that no real profit is likely to result. And to say that, because the city makes a charge for furnishing water to private consumers, it follows that the operation of the water works is corporate and not governmental, is to beg the question. What the city is engaged in doing in that respect is rather rendering a service than selling a commodity. If that service be governmental it does not become private because a charge is made for it, or a profit realized."

[2] After a careful consideration of the various other points raised on this motion, it is the opinion of this court that Public Utility District #2 is a municipal corporation not engaged in a private and proprietary venture. As such the monies, held by the Bankers Trust Company, in two funds, are not subject to attachment. The court, in the light of this conclusion, finds it un-

necessary to determine the trust status of these funds.

Levy of attachment is hereby vacated, and service of the summons set aside.

So ordered.