OPINION OF THE COURT
Patrick D. Monserrate, J.
Petitioner John Karedes seeks relief in the nature of mandamus to require respondent Mayor Michael Colella of the Village of Endicott (Broome County) to execute a contract between petitioner and the Village which was approved by its Board of Trustees. Additionally, petitioner seeks a determination that the contract is valid and enforceable (CPLR art 78).[1]
Background
The Village is the owner (since 1964) of the En-Joie Golf Club (Club), an 18-hole layout featuring pro shop and restaurant, which was originally constructed (c. 1927) for the benefit of its employees by the famously paternalistic Endicott-Johnson Corporation.
In March 1996 the Village contracted with Karedes to be the general manager of the Club. The contract (for an initial term of one year) was approved by the six-person Village Board of Trustees[2] (on which the Mayor, ex officio, has voting privileges) at its March 11th meeting and was thereafter (on the 29th) signed by (then) Mayor David Archer on behalf of the Village. *658 In 1997 the Board approved a similar agreement for an additional term of three years, until March 2000. As of January 1, 2000 respondent Dr. Michael Colella succeeded Archer as Mayor. Later that month Karedes sent a letter to the Mayor (copying the Trustees) seeking to initiate negotiations toward a renewal of his contract.
The subject of continuing — or not — the contract with Karedes (and, if so, on what terms) was discussed at no less than three Board meetings between then and March 13th when the Trustees voted four to two to approve a four-year extension of the Karedes contract; Mayor Colella added a third dissenting vote. That contract, in the form approved by the Board, has gone unexecuted by the Mayor on behalf of the Village.
The Mayor was widely quoted at the time as being opposed to approving the agreement since, to his view, the contract relationship with Karedes was not in the best interests of the Village. The Mayor is quoted in the minutes of the Board’s March 27th meeting (petitioner’s exhibit X) as saying “that he cannot sign this contract and will not sign this contract.” Later, in a June 9th memo to the Mayor (Colella affidavit exhibit A), petitioner clearly showed his awareness of the Mayor’s position:
“Where is my signed contract? The Village of Endicott Board of Trustees authorized and directed you to sign a contract negotiated in good faith. You have refused to do so, claiming it would not be in the best interest of the voters of the Village of Endicott.”
In his affidavit in opposition, the Mayor (while not necessarily abandoning his “best interests of the Village” posturing) adopts the legalistic approach of his lawyers: petitioner’s proceeding is time barred and his contract was/is invalid on its face.
Issues Presented
As delineated by the pleadings, memoranda of law, and oral argument, the parties, through their respective counsel, seek resolution of the following issues:
• Whether respondent Mayor may be court-ordered to sign the contract with petitioner as approved by the Village Board of Trustees.
*659 • If so, whether petitioner’s article 78 proceeding to require him to do so is time barred by the four-month Statute of Limitations.
• If so, whether the remainder of the petition may be converted to an action for a declaratory judgment so that the validity of the contract and the rights of the parties thereunder may be expeditiously adjudicated.
• If so, whether the contract between petitioner and the Village is valid although unsigned by the Mayor.
• If so, whether the contract with petitioner is a “professional services contract,” as would exempt it from competitive bidding requirements.
• If so, whether the contracting by a municipality for professional services to manage a golf course which it owns is a proprietary function (as contrasted from a governmental function).
• If so, whether petitioner’s contract with respondent Village is valid and enforceable according to its terms.
Discussion
Initially, it is well to remind all concerned of the function of the courts in disputes such as this. If the subject contract was within the power of the respondent Village to make, and has been duly entered into, the court may consider only its validity under the law. Questions of whether the contract is wise or whether its terms are advantageous for the taxpayers and other residents of the Village are solely for the elected Village officials to decide (27 NY Jur 2d, Counties, Towns, and Municipal Corporations, § 1208, at 206). In short, it is for the court to say whether the Village could have contracted with petitioner as it did, not whether it should have.
The Rule of Law
It is often stated, and always recognized as the very cornerstone upon which this Republic is founded, that ours is a *660 Nation of laws, not of men. The meaning of the phrase is simple: No one is above the law’s command; no one is below the law’s protection. When applied to persons serving in public office, the concept is a constant reminder that they have only those powers as are given by law, and that they must perform those duties required by law, even when that performance is personally distasteful. Political disagreements are to be expected, personal disappointments are to be understood, but wilful disobedience of the rule of law is not to be tolerated.[8]
Throughout our history, in matters great and small, it has often been a court which has been designated as the medium for the message. Sometimes the rule of law at hand is that contained in our venerable Federal Constitution. So it was in the early nineteenth century when a court was asked to direct the Secretary of State in an incoming administration that he must sign the commission of a Justice of the Peace for the District of Columbia who had been appointed by the outgoing President of a different political persuasion.[4] And in the twentieth century, a sitting President was directed to comply with a legislative subpoena and surrender incriminating evidence which would inexorably lead to his being driven out of office.[5] Or in the present century, a contender for that same Presidency — and the winner of the popular vote — was told that the recounting which he sought of one State’s votes would cease, and he must thereby be the loser of the election.[6] His response was a paradigm of statesmanship, and a model for citizenship: “Let there be no doubt, while I strongly disagree with the court’s decision, I accept it.” Earlier in his text he, too, had paid homage to the rule of law: “Not under man, but under * * * law. That’s the ruling principal of American freedom, the source of our democratic liberties.” Well said.
More often the rule of law at issue is a star of lesser magnitude than a constitution, and the impact of its application does not imperil the future of the Republic. However, no *661 law is so insignificant that its dictates may be ignored, particularly by a public official with an oath-bound duty to faithfully execute the law-given duties of his office. His option is not to pick and choose among those duties which he will deign to perform and those he will not. Rather, his choice is to obey the law or resign the office.
The Legislature of our State, by enacting (and amending over time) the Village Law, has determined the distribution of powers and responsibilities of the officials selected by a village’s electorate to govern them. Section 4-412 (1) of the law’s current version sets forth the “powers” of a village’s board of trustees, which includes the authority to approve contracts with the village.
Section 4-400 (1) begins with the phrase “It shall be the responsibility of the mayor” and proceeds to enumerate the duties of that office. Among them (subd [1] [i]) is “to execute all contracts in the name of the village.” It is notable that a village mayor is given no authority to veto any action taken by the board of trustees.
The referenced separation of powers and responsibilities with respect to village contracts — the board of trustees approves them (or not) and the mayor signs those which are approved — has been consistently interpreted as saying what it means and meaning what it says (Bailey v Colonna, 73 Misc 2d 299 [Sup Ct, Clinton County 1972]; 1981 Atty Gen [Inf Opns] 212).
In the matter at hand, then, however heartfelt and ingenuous were the respondent Mayor’s feelings — or even how correct he was as to whether it was a “good” contract for the Village — he had an oath-bound duty to sign the petitioner’s contract; a duty which, if need be, could be enforced by court order.
But it will not be the role of this court to make that direction — this time. As the Mayor pleads and his counsel argues, petitioner delayed too long in seeking the court’s intervention. An article 78 proceeding in the nature of mandamus must be commenced within four months after the cited public officer refuses to act or to perform a duty enjoined by law (CPLR 217 [1]; Matter of Waterside Assocs. v New York State Dept. of Envtl. Conservation, 72 NY2d 1009 [1988]; Steck v Jorling, 182 AD2d 937 [3d Dept 1992], appeal dismissed 80 NY2d 893 [1992]; Mieczkowski v Ithaca Coll., 131 AD2d 942 [3d Dept 1987]).
Whether one views the opening of petitioner’s window of opportunity to have occurred as early as March (when the Mayor *662 publicly declared his intentions) or as late as June (when petitioner directly challenged him on his position), it is clear that the critical four-month period had long since expired by the time this proceeding was commenced (by filing) on December 27th.
Declaratory Relief
However, the contract still exists, and may be enforceable by or against the Village notwithstanding the absence of the Mayor’s withheld signature (.Matter of Municipal Consultants & Publs. v Town of Ramapo, 47 NY2d 144, 150 [1979]).
Since the parties thereto, petitioner and the Village, are jurisdictionally before the court, and each (in one way or another) has asked for a determination as to the legality and enforceability of the contract, to the court’s view that can be accomplished — thus saving the parties the time and expense of yet another lawsuit over basically the same issue — were petitioner’s article 78 proceeding, insofar as it deals with the validity of the contract, to be converted to an action for a declaratory judgment on the issues raised (CPLR 103 [c]; 3001; Matter of Lake v Binghamton Hous. Auth., 130 AD2d 913 [3d Dept 1987]).
“Term Limits”
Respondent Village in (now) attacking the contract, cites the line of New York authority to the effect that it is violative of the State’s public policy for a municipal board, in matters of governmental activity, “to contract beyond its own term” (Edsall v Wheler, 29 AD2d 622, 623 [4th Dept 1967]). The rationale is to ensure that members of each governing body (as terms and membership changes) will have the right to chart their own course for governing, unrestricted by what their predecessors may have done — or not.
“Elected officials must exercise legislative and governmental powers, within their own sound discretion, as the needs require. Ordinarily they may not so exercise their powers as to limit the same discretionary right of their successors to exercise that power and must transmit that power to their successors unimpaired” (Morin v Foster, 45 NY2d 287, 293 [1978]).
*663 What the court will refer to as the “term limits” doctrine[7] may be particularly apt to the case at bar, since at the end of each calendar year the Village of Endicott Board of Trustees may be “changed significantly” (Matter of Harrison Cent. School Dist. v Nyquist, 59 AD2d 434, 436 [3d Dept 1977]) as the two-year terms of two of the six members expire, resulting in a possible annual turnover by as much as one third.[8]
That circumstance has a direct bearing on contracts, like petitioner’s, for professional services to the Village of Endicott (by, e.g., attorneys, accountants, engineers, architects, etc.) which the Board of Trustees may approve from time to time. While their “professional services” character — “sensitive and confidential,” involving specialized skills, expertise, the exercise of judgment and discretion (Matter of Martin v Hennessy, 147 AD2d 800, 802 [3d Dept 1989]) — exempts them from competitive bidding requirements (see, e.g., General Municipal Law § 103) the “governmental powers” involved in approving such contracts possibly places them squarely within the “term limits” restriction (Morin v Foster, supra).
The practical effect would be that the term of professional services contracts with the Village of Endicott could not be for longer than one calendar year, or for some lesser term calculated from the effective date of a contract to the end of any year. In petitioner’s case, that would mean that, at best, the term of his contract to manage the En-Joie Golf Club commenced on March 15, 2000 and ended on December 31st of that year.
“Governmental” vs. “Proprietary” Contracts
The court’s use of “possibly” to describe the applicability of the “term limits” doctrine to a contract such as petitioner’s is out of deference to an issue as yet unaddressed. Petitioner’s counsel argues thus: Assuming, arguendo, that his client’s *664 contract is one for professional services,[9] the “term limits” doctrine does not apply to contracts (such as petitioner’s) which a municipality makes, acting through its proprietary (vs. governmental) persona.
The distinction between governmental and proprietary/ business functions of government has been the subject of litigation in New York — and beyond[10] — for decades, and has yielded little by way of ease of understanding or certainty of application. References to a few Court of Appeals decisions, over time, serve (only) to illustrate the complexity of the problem, without providing much by way of guideposts toward a formula of solution.
“Whether a particular activity involves a governmental function or one proprietary is a matter not always easy of determination. Past decisions, mostly in the field of tort liability [citations omitted], prove of little value, and no all-embracing formula or definition is possible” (Nehrbas v Incorporated Vil. of Lloyd Harbor, 2 NY2d 190, 194 [1957]).
“[T]he legal classification of a particular municipal activity as governmental or proprietary is, in this transitional age, subject to change with time and circumstance” (Little Joseph Realty v Town of Babylon, 41 NY2d 738, 742 [1977]).
And the following year, in its Morin decision {supra, at 293), the Court “passed” on the opportunity for a detailed discussion of the difference between the business of government and government in business with this terse comment:
“We need not define all the types of activity covered by the broad rubric ‘governmental activity’ as applicable in the context of this [term limits] rule, although there can be no doubt [?!?] that business matters are not affected (10 McQuillin, Municipal Corporations, § 29.101)” (emphasis supplied).
*665 That imprimatured treatise, at the referenced section, yields the following restatement of the rule:
“Respecting the binding effect of contracts extending beyond the terms of officers acting for the municipality, there exists a clear distinction in the judicial decisions between governmental and business or proprietary powers. With respect to the former, their exercise is so limited that no action taken by the governmental body is binding upon its successors, whereas the latter is not subject to such limitation, and may be exercised in a way that will be binding upon the municipality after the board exercising the power shall have ceased to exist” (10 McQuillin, Municipal Corporations, § 29.101, at 43-44).
Later in the text (18A McQuillin, op. cit., § 53.115, at 210) the discrete issue at hand is addressed as follows:
“Although there is authority to the contrary [citing cases (only) from Georgia and Michigan], the maintenance and operation of a municipal golf course is a proprietary, rather than a governmental function.”
The McQuillin conclusion is consistent (by contrast) with his description of the “factors denoting a governmental function”:
• An activity historically engaged in by local government,
• Which is uniformly so furnished today,
• Which could not be performed as well by a private corporation,
• Which is not undertaken for profit or for revenue, and
• Which is within the imperative public duties imposed on a municipality as an agent of the state.
Since none of the cited factors applies to a municipality’s ownership/operation of a golf club, the position that the Village of Endicott’s contract with petitioner to manage En-Joie Golf Club was of a proprietary nature seems eminently reasonable.
*666 Certainly, nothing in the subject contract itself compels a different result.[11] It recites the Village’s ownership of the Club and petitioner’s experience and expertise concerning the management, operation, and administration of such facilities. The Village agrees to pay petitioner a set consulting fee each year, together with 10% of the net income (over $100,000) from the Club, with the remaining 90% being retained by the Village. Overall, pretty standard fairway fare.
Given that neither side has cited the court to (nor has its independent research found any) New York case law at any level holding on either side of the governmental vs. proprietary issue,[12] the court is inclined to follow the lead — such as it is — of the Court of Appeals (which, more than once, anointed him as its spokesman) that, in distinguishing between those contracts which are governmental and those which deal with proprietary/ business matters, McQuillin’s word is law.
From that regula the court is led to conclude that, in contracting with petitioner to manage its golf club, respondent Village was acting through its “business” persona (rather than its governmental one) and, therefore, the term of that contract could legally transcend the terms of those who approved it (and be binding on Trustees, past, present, and future, who may not approve of it).
, Conclusion
The court answers in the affirmative each of the issues posited at page 4 (supra).
*667 By reason of the foregoing, that aspect of the petition which seeks to have the court order respondent Mayor to sign the contract between petitioner and respondent Village (approved by its Board of Trustees on March 13, 2000) is denied and dismissed as time barred.
That aspect of the article 78 petition seeking a declaration of the validity of the subject contract is converted to an action for a declaratory judgment and the court makes the following declaration (CPLR 3001): The management consulting agreement pertaining to the management of the En-Joie Golf Club between John Karedes and the Village of Endicott, approved by the latter’s Board of Trustees on March 13, 2000, is valid and enforceable by and against the parties thereto according to its terms, notwithstanding the absence of a signature thereon by the Mayor of the Village.

. The petition also seeks a broad range of other relief which the court deems to be at best premature and at worst beyond the court’s authority to grant under present facts and circumstances. Among those is a request that the Village be restrained (in advance) “from taking any action to terminate or otherwise interfere with [the contract],” and awarding petitioner “attorney fees” with no citation to statutory or case law authority for such an award in an article 78 proceeding.

. It is significant, in light of the issues raised herein, that by local law (Local Laws, 1946, No. 1 of the Village of Endicott) the terms of two members expire on December 31st of each year.

. One of the better formulations of the thought comes from President Theodore Roosevelt’s 1903 Annual Message to Congress (the written precursor of the modern State of the Union Address):
“No man is above the law and no man is below it; nor do we ask any man’s permission when we require him to obey it. Obedience to the law is demanded as a right; not asked as a favor.”

. Marbury v Madison, 1 Cranch [5 US] 137 (1803).

. United States v Nixon, 417 US 960 (1974).

. Bush v Gore, 531 US 98 (2000).

. The terms of office of the members of a governing body of a municipality may limit the permissible term of certain public contracts which it approves.

. Ironically, that is precisely what happened in the Village of Endicott in 2000 when two incumbent Trustees (who had voted in favor of petitioner’s contract) were defeated for reelection. The Mayor would undoubtedly ascribe as their political epitaph: “Post hoc ergo propter hoc.” Also, there is nothing in the terms of the contract itself as would remove it from the ambit of the rule (such as a unilateral termination option “if deemed in the best interests of the [Village]” [Matter of Ramapo Carting Corp. v Reisman, 192 AD2d 922 (3d Dept 1993)]).

. A concession virtually thrust upon him by contemplation of the alternative. If it isn’t, then its four-year term, with guaranteed compensation of over $160,000 (plus 10% of the net) would bring it into contact with the “third rail” nullification sanctions as a violation of the competitive bidding laws (D’Angelo v Cole, 67 NY2d 65, 70 [1986]).

. “There probably is no topic of the law in respect of which the decisions of the state courts are in greater conflict and confusion than that which deals with the differentiation between the governmental and corporate powers of municipal corporations” (Brush v Commissioner of Internal Revenue, 300 US 352, 362 [1937]).

. Despite the paucity of case law on the issue at hand, a small consensus seems to have evolved that the focus of the “term limits” inquiry should be the subject matter of the contract, rather than simply whether it is a “municipal contract” or a “professional services” contract (27 NY Jur 2d, Counties, Towns, and Municipal Corporations, § 1216, at 218).

. To be sure, there are isolated cases which might have dealt with the issue had not other distractions been involved. For example, the Appellate Division, Third Department, had before it a contract between a school district and a cleaning service “for support management services relating to custodial and maintenance needs” for school buildings. Proprietary? The Court found that there was a summary judgment-precluding question of fact as to whether the agreement was a professional services contract as would exempt it from competitive bidding (Matter of Schulz v Cobleskill-Richmondville Cent. School Dist., 197 AD2d 247 [1994]). Or, better yet, when a woman was injured in a fall on a walkway at the En-Joie Golf Club and sued the Village of Endicott, claiming that the Village’s prior-notice statute was not applicable since it owned En-Joie Golf Club in its proprietary capacity as a landlord. The same Court found “no proof in the record” to support the proprietary capacity theory, and affirmed the summary dismissal of her claim (Kadlecik v Village of Endicott, 174 AD2d 923 [1991]).